# IN THE SUPREME COURT OF IOWA

No. 05–0883

Filed March 19, 2010

**STATE OF IOWA,**

Appellee,

vs.

**CHRISTOPHER DEANGELO SPATES,**

Appellant.

___

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Jon C. Fister, Judge.

Alleging instructional error, defendant seeks further review of court of appeals' decision affirming defendant's first-degree murder conviction. **DECISION OF COURT OF APPEALS VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Clemens A. Erdahl, Eric D. Tindal, and Sara L. Smith of Nidey Peterson Erdahl & Tindal, PLC, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Joel Dalrymple and D. Raymond Walton, Assistant County Attorneys, for appellee.

**TERNUS, Chief Justice.**

The appellant, Christopher Spates, was convicted of first-degree felony murder for the killing of a bystander during a gun battle between rival groups in Waterloo, Iowa. Spates raised several issues on appeal, but they were all rejected by the Iowa Court of Appeals. This court subsequently granted his application for further review for purposes of considering two allegations of trial court error: (1) the failure to give an instruction on voluntary manslaughter and (2) the submission of a "mutual combat" instruction.

We conclude error was not preserved on the trial court's decision not to submit voluntary manslaughter as a lesser-included offense of first-degree murder. In addition, we hold the trial court did not err in instructing on the theory of mutual combat as a basis for the defendant's culpability as an aider and abettor. We vacate that portion of the court of appeals' decision addressing the defendant's allegations of instructional error and affirm the district court's judgment of conviction and sentence.

## I. Background Facts and Proceedings.

In the early morning hours of October 10, 2004, a fight occurred between two rival groups, the "L-Block" and "The Hood," in the parking lot of a Waterloo bar. Although the defendant was not present at this fight, several members of his extended family, including his brother, Carl, and cousins, Dornodis and Damean, were involved either as members or associates of The Hood. After the fight, Carl, Dornodis, Damean, and three other Hood members or associates, who had been at the bar fight, drove to the house where the mother of the defendant and Carl lived. The men were angry and decided to "go find" the L-Block members. Carl went into the house and returned with an assault rifle.

The group then proceeded to Damean's house where they met up with the defendant who was driving his mother's GMC Yukon Denali, which he was purchasing from her. The defendant agreed to join in the effort to find the L-Block group. They knew L-Block members sometimes hung out at 130 Harrison Street, so they proceeded to that location, a third car joining them en route. This caravan of cars was captured on video by a police officer who happened to have his camera turned on during an unrelated traffic stop. A trial expert testified that the vehicles shown on this video were consistent with the three cars driven to 130 Harrison, including the defendant's Denali.

Seeing a number of persons outside 130 Harrison, the group parked their vehicles a block away and proceeded on foot to 137 Harrison, an area across the street from 130 Harrison. According to testimony of witnesses at trial, the defendant had a shotgun, his brother had the assault rifle, and other members of the group had additional weapons. Although there was conflicting evidence about who fired the first shot, it is undisputed that shots were fired by the defendant's group. Numerous casings were found at the scene, including evidence that two shotguns had been fired. During the gunfire, a woman in the kitchen of 130 Harrison was killed. Ballistic evidence confirmed the bullet that struck this bystander was shot by an assault rifle, but the bullet could not be linked to any specific weapon.

After the shooting, the individuals in the defendant's group fled the scene. Dorondis had been shot in the shoulder. Accomplice testimony indicated the defendant took Dorondis to a nearby hospital, and DNA evidence confirmed that blood found in the Denali belonged to Dorondis.

Twelve days later, the defendant, his brother, Carl, and his cousins, Dorondis and Damean, were charged with first-degree felony murder. The trial information alleged the defendants killed the victim while participating in a forcible felony. *See* Iowa Code § 707.2 (2003). The defendant pled not

guilty. In exchange for testifying against the defendant and Carl, Dorondis and Damean entered into plea agreements pleading guilty to unspecified crimes with an aggregate term of twenty-five years.

The charges against the defendant and his brother were jointly tried to a jury. The first-degree murder charge was submitted under felony-murder instructions allowing the jury to find either defendant guilty as a principal or as an aider and abettor.[1] The predicate forcible felonies were those listed in the information: intimidation with a dangerous weapon or assault causing serious injury. The jury was also instructed on the lesser-included offenses of second-degree murder and involuntary manslaughter, but returned a guilty verdict on the first-degree murder charge. The defendant's posttrial motions were denied, and he was sentenced to life in prison.

The defendant's subsequent appeal was transferred to the court of appeals. That court affirmed the defendant's conviction and judgment of sentence. We granted the defendant's application for further review to consider two issues: (1) whether the district court erred in failing to instruct on the lesser-included offense of voluntary manslaughter and (2) whether the district court erred in giving an instruction on the subject of "mutual combat." *See Anderson v. State*, 692 N.W.2d 360, 363 (Iowa 2005) ("On further review, we can review any or all of the issues raised on appeal or limit our review to just those issues brought to our attention by the application for further review.").

## II. Voluntary Manslaughter Instruction.

On appeal, the defendant asserts the trial court erred in failing to instruct the jury on voluntary manslaughter as a lesser-included offense of

---

[1]The prosecution tried the case on the theory that Carl shot the fatal bullet, and the defendant aided and abetted him.

first-degree felony murder. The State claims the defendant failed to preserve error on this issue.

Iowa Rule of Criminal Procedure 2.6(3) requires the trial court to instruct on lesser-included offenses, "even though such instructions have not been requested." Notwithstanding the trial court's duty in this regard, we have a long-standing requirement that, to preserve error on a trial court's failure to instruct on a lesser-included offense, "a defendant must request a lesser-included offense instruction or object to the court's failure to give it." *State v. Jeffries*, 430 N.W.2d 728, 737 (Iowa 1988); *accord State v. Wallace*, 475 N.W.2d 197, 202 (Iowa 1991); *cf. State v. Ondayog*, 722 N.W.2d 778, 785 (Iowa 2006) (requiring defendant to object to trial court's instruction on lesser-included offense to preserve error). A corollary of this requirement is the rule that "a defendant may expressly waive a lesser-included offense instruction." *Jeffries*, 430 N.W.2d at 737; *accord State v. Greer*, 439 N.W.2d 198, 200 (Iowa 1989). Even when a defendant waives submission of lesser-included offenses, the State retains the right to demand submission of a lesser offense. *See Greer*, 439 N.W.2d at 200. In *Greer*, this court recognized that the State may also have "a legitimate interest in having a lesser-included offense . . . submitted to the jury," and therefore, the defendant does not have "veto power . . . to block submission of any lesser-included offense which the accused does not fancy." *Id.*[2]

---

[2]We recently stated in dicta in *In re Z.S.*, 776 N.W.2d 290 (Iowa 2009), that Iowa follows the "trial integrity" model in determining whether a lesser-included offense instruction should be given to the jury. *In re Z.S.*, 776 N.W.2d at 295. Under this model, the trial judge must give an instruction "on any lesser-included offense supported by the evidence, even if neither party requests one. . . . This analytical model does not permit the parties to adopt an all-or-nothing trial strategy." *State v. Cox*, 851 A.2d 1269, 1272 (Del. 2003). As the Iowa cases demonstrate, we give the parties some autonomy to determine whether a lesser-included offense is submitted to the jury. If both the defense and the prosecution agree that a lesser-included-offense instruction should not be given, the trial judge does not commit error in failing to instruct on the lesser-included offense. To the extent *In re Z.S.* implies a different rule, we disavow it.

The record reveals the trial court submitted its proposed instructions to the county attorney and to the attorneys for the defendant and his brother, Carl, before final arguments. These instructions did not include an instruction on voluntary manslaughter. The trial court specifically directed the attorneys' attention to the subject of lesser-included offenses. The county attorney, Mr. Ferguson, stated that murder in the second degree and involuntary manslaughter should be submitted. The court then asked Mr. Standafer and Mr. Bevel, the defendant's attorneys, for their response. The following discussion ensued:

> MR. BEVEL: Well I think we would just—we would ask voluntary manslaughter—
>
> (Discussion was had between Mr. Bevel and Mr. Rauch.)
>
> MR. STANDAFER: Judge, this is one of them unique situations, I guess it happens sometimes, but as co-counsel I think Mr. — I just got to be honest with the Court, Mr. Bevel and I disagree. I don't think it's appropriate to submit—and I think I addressed this to the Court earlier—I don't think it's appropriate to submit voluntary manslaughter in this case.
>
> THE COURT: Okay.
>
> MR. FERGUSON: Just so the record is clear, Your Honor, voluntary manslaughter is a lesser included under a legal theory, but it would not be under the facts as submitted, the evidence in this case—[3]
>
> MR. STANDAFER: That's what I have a problem with.

---

[3]If an offense is legally included within the charged offense and there is a factual basis for submission of the lesser offense, the court may properly submit the lesser offense to the jury. *State v. Ware*, 338 N.W.2d 707, 714 (Iowa 1983). Under our legal-elements test for lesser-included offenses, the lesser offense must " 'be composed . . . of some but not all of the elements of the greater offense[].' " *Jeffries*, 430 N.W.2d at 736 (quoting *State v. Lampman*, 345 N.W.2d 142, 143 (Iowa 1984)). Logically, then, if the lesser offense meets the legal-elements test and there is a factual basis for the greater offense, the lesser offense automatically meets the factual test. *Id.* The factual test is not automatically met, however, when a crime that does not meet the legal-elements test is made a lesser-included offense by statute. *Id.* at 737. In those instances, the trial court must separately "determine if sufficient evidence exists to submit [the] statutorily mandated lesser-included offense[]." *Id.* By statute, voluntary manslaughter is an included offense of felony murder. *See* Iowa Code § 707.4; *Jeffries*, 430 N.W.2d at 737. Therefore, it was necessary for the trial court to find substantial evidence in the record supporting the elements of this crime before it was required to submit this lesser-included offense to the jury.

>THE COURT: Okay. That's your position and Mr. Ferguson's position. Mr. Bevel thinks—
>
>MR. BEVEL: Well I'll—I'll—
>
>MR. STANDAFER: I think Mr. Ferguson is correct. And—and for strategic—I'll just say for the record on behalf of my client, for strategic reasons, also, and based on the facts, I don't think it's in my client's best interest to submit voluntary manslaughter.

At that point, the attorneys for codefendant, Carl Spates, requested that voluntary manslaughter be included in the court's instructions, claiming it was a lesser-included offense of first-degree murder and there was substantial evidence to support its submission. The trial court ultimately determined there was not a factual basis for this offense and did not submit voluntary manslaughter to the jury.

We do not think the defendant preserved error on this issue. The only position articulated to the court on behalf of the defendant was Mr. Standafer's opinion that an instruction on voluntary manslaughter was not supported by the evidence and was not desirable for strategic reasons. Although the trial court was aware there was a disagreement between the defendant's attorneys with respect to whether it was in the defendant's interest to have an instruction on this lesser-included offense, it clearly appeared that Mr. Standafer's position prevailed as between the defendant's counsel. The fact that cocounsel harbored doubts about the chosen strategy is not sufficient to preserve error in the face of the express waiver made by Mr. Standafer on the defendant's behalf.

The court of appeals addressed the merits of the defendant's claim that an instruction on voluntary manslaughter should have been given. Because the defendant did not preserve error on this issue, we vacate that part of the court of appeals' decision holding the trial court did not err in refusing to submit voluntary manslaughter as a lesser-included offense.

### III. Mutual-Combat Instruction.

**A. Scope of Review.** "[W]e review challenges to jury instructions for correction of errors at law." *Anderson*, 692 N.W.2d at 363. Our review is to determine whether the challenged instruction accurately states the law and is supported by substantial evidence. *State v. Predka*, 555 N.W.2d 202, 204 (Iowa 1996). Error in giving a particular instruction does not warrant reversal unless the error was prejudicial to the party. *Thavenet v. Davis*, 589 N.W.2d 233, 236 (Iowa 1999).

**B. Instruction and Objection.** At trial the court instructed the jury as follows:

> If you find that either of the defendants, or any person or persons that either of the defendants was acting together with, were voluntarily engaged in mutual combat by shooting guns at each other and that, by exchanging gunfire, they jointly created a zone of danger likely to result in the death or injury of innocent bystanders, then you may also find that each of the combatants, including the defendant, aided and abetted each of the other combatants and it makes no difference which of the combatants fired the first shot or which of the combatants fired the shot which struck and killed [the victim].
>
> To constitute "mutual combat" there must exist a mutual intent and willingness to fight and this intent may be manifested by the acts and conduct of the parties and the circumstances attending and leading up to the combat.

The defendant objected to this instruction at trial on the basis that a defendant could not be held liable as an aider and abettor under a theory of mutual combat when the prosecution could not prove who fired the shot that killed the innocent bystander. On appeal, the defendant renews this objection and also argues the instruction gave undue prominence to certain evidentiary facts. The latter objection was not raised at trial and cannot be asserted for the first time on appeal. *See State v. Sanborn*, 564 N.W.2d 813, 815 (Iowa 1997) ("A defendant may not rest an objection on one ground at trial, and rely on another for reversal on appeal."). Therefore, we consider

only whether the challenged instruction was properly given under the facts of this case.

**C. Definition of "Mutual Combat."** Before we can determine whether the record supported a mutual-combat instruction, we must establish what is meant by "mutual combat." From our review of the authorities, we conclude "mutual combat" is more than "a reciprocal exchange of blows." *People v. Ross*, 66 Cal. Rptr. 3d 438, 447 (Cal. Ct. App. 2007). It requires "a mutual intention, consent, or agreement preceding the initiation of hostilities." *Id.* (emphasis omitted); *see also Sanders v. State*, 659 S.E.2d 376, 380 (Ga. 2008) ("A charge on mutual combat 'is warranted only when the combatants are armed with deadly weapons and mutually agree to fight.' " (quoting *Hudson v. State*, 623 S.E.2d 497, 498 (Ga. 2005)). Thus, an express or tacit agreement to engage in violence, while sufficient, is not required; it is enough that "there was a concurrent or mutual expectation that a street battle would ensue." *Roy v. United States*, 871 A.2d 498, 508 (D.C. Ct. App. 2005); *accord Alston v. State*, 662 A.2d 247, 254 (Md. 1995).[4]

We think the trial court's definition of the term "mutual combat" was consistent with these authorities: "To constitute 'mutual combat' there must

---

[4]In *Roy*, the court held that proof the defendant was "armed and prepared to engage in gun battle" was "the functional equivalent" of "a concurrent or mutual expectation" of armed violence. 871 A.2d at 507–08. In *Alston*, the court acknowledged there was no express agreement to engage in a gun battle, but concluded the jury

> had sufficient evidence from which it could find that all of the participants, driven by an unwritten code of macho honor, tacitly agreed that there would be mutual combat. The conclusion is supported by the evidence that the trouble began on Sunday, that following the events of Monday, Hall [a member of the defendant's gang] found it necessary to go about armed, that D Nice [a member of the rival gang] fatalistically observed that more people would be hurt, and that the [defendant's] group used the vicinity of Robert and Brunt Sts. as a staging area for the impending battle.

662 A.2d at 254.

exist a mutual intent and willingness to fight and this intent may be manifested by the acts and conduct of the parties and the circumstances attending and leading up to the combat." We next examine how this concept relates to a defendant's criminal liability for the death of an innocent bystander.

**D. Relevancy of Mutual-Combat Situation.** In other jurisdictions, a defendant's participation in mutual combat has been employed to assist in proving the defendant's responsibility for the death of an innocent bystander even when the defendant's act was not the direct cause of the bystander's death. Criminal responsibility in these cases has rested on one of two theories: (1) the defendant's conduct is a proximate cause of the bystander's death, so the defendant is liable as a principal; or (2) the defendant's participation in the combat encouraged the murderous acts so as to make the defendant liable as an aider and abettor of the actual killer. It is helpful to review some of these cases before we analyze whether the instruction given in this case was proper.

1. *Proximate cause liability.* In some cases, the fact that various individuals were engaged in a gun battle has been used to establish that conduct of a defendant, who was not proved to have fired the fatal shot, was still a proximate cause of an innocent bystander's death. *See, e.g., People v. Sanchez*, 29 P.3d 209, 219–20 (Cal. 2001) (first-degree murder); *Roy*, 871 A.2d at 508 (second-degree murder); *Phillips v. Commonwealth*, 17 S.W.3d 870, 875 (Ky. 2000) (wanton murder); *Commonwealth v. Santiago*, 681 N.E.2d 1205, 1215 (Mass. 1997) (first-degree murder). In these cases, the defendant was held criminally responsible as a principal on the basis of his own conduct.

For example, in *Roy*, the defendants were convicted of second-degree murder stemming from an incident in which they "opened fire on one

another on a public street, resulting in the death of an innocent bystander." 871 A.2d at 501–02. The appeals court found no error in the trial court's instruction on causation, which required proof that the defendant's conduct was a substantial factor in the bystander's death, but not that the defendant fired the fatal shot. *Id.* at 506–07. The court noted,

> [o]ther jurisdictions have extended proximate cause liability to participants in gun battles, finding that an individual's participation in such a battle represents a depraved indifference to human life such that he or she meets the *mens rea* for second-degree depraved heart murder. Further, courts have determined that the combined hail of bullets that result from such a battle are jointly responsible for the fatal injury, such that a determination of which defendant's bullet "actually" caused the death is unnecessary. Finally, courts have found that a death which results from the shower of bullets created during this type of battle is more than reasonably foreseeable, *i.e.,* conscious awareness of danger.

*Id.* at 507 n.10.[5]

In the *Santiago* case, the Massachusetts court concluded the defendant could be found guilty of first-degree murder even if the prosecution could not prove that "he fired the fatal shot." 681 N.E.2d at 1214. Noting "[t]he defendant's acts need not be the sole or exclusive cause of death," the court held:

> By choosing to engage in a shootout, a defendant may be the cause of a shooting by either side because the death of a bystander is a natural result of a shootout, and the shootout could not occur without participation from both sides.

*Id.* at 1215.

---

[5]The District of Columbia court approved an instruction on "proximate cause liability" for second-degree murder that required the prosecution to prove: (1) the defendant "was armed and prepared to engage in a gun battle"; (2) "the defendant did, in fact, engage in a gun battle" at the time and place alleged; (3) "the defendant did not act in self-defense"; (4) the defendant's conduct "was a substantial factor" in the bystander's death; and (5) "it was reasonably foreseeable that death or serious injury to innocent bystanders could occur as a result of the defendant's conduct." *Roy*, 871 A.2d at 506–07 n.8.

2. *Liability as an aider and abettor.* A similar result has been reached under the theory that a person who engages in mutual combat aids and abets the person whose gun fired the fatal bullet, regardless of whether the shooter and the defendant were on the same side. *See, e.g., Alston,* 662 A.2d at 252; *People v. Russell,* 693 N.E.2d 193, 195 (N.Y. 1998); *cf. State v. Garza,* 916 P.2d 9, 15 (Kan. 1996) (holding defendant could be held liable as an aider and abettor for his opposing combatant's injury of an innocent bystander struck by a stray bullet). For example, in *Alston,* the Maryland court affirmed a second-degree murder conviction of a participant in a gun battle, despite proof that the innocent bystander was shot by a member of the rival gang. 662 A.2d at 247–48. The court rejected the defendant's argument that he could not be found to have aided and abetted the killer because they were adversaries in the gun battle, stating:

> Each participant, prior to the actual combat, was willing to use lethal force when the opposing groups met. Each participant manifested depraved heart malice toward non-combatants when the two groups met and sought to kill each other as they previously had determined to do. There would have been no mutual combat, and no murder of an innocent person, but for the willingness of both groups to turn an urban setting into a battleground. In this sense each participant is present, aiding and abetting each other participant, whether friend or foe, in the depraved conduct.

*Id.* at 252; *accord Reyes v. State,* 783 So. 2d 1129, 1132–33 (Fla. Dist. Ct. App. 2001) (holding "each participant in a mutually agreed-to-gun battle in a public place may be held accountable for any death or injury to an innocent person which results from that confrontation").

Similarly, in *Russell,* the defendant's second-degree murder conviction was upheld even though it could not be established who shot the stray bullet that killed an innocent bystander. 693 N.E.2d at 194. Finding "there was adequate proof . . . that the three defendants tacitly agreed to engage in the gun battle that placed the life of any innocent bystander at grave risk," *id.* at

195, the court concluded there was adequate proof that all three defendants acted with the requisite mental culpability "and that they intentionally aided and encouraged each other to create the lethal crossfire that caused the death of [the victim]," *id.* at 196.

**E. Relevant Iowa Cases.** Our court has not had the occasion to consider the criminal liability of mutual combatants for injury to an innocent bystander. We have, however, addressed criminal responsibility in an analogous situation—drag racing. *See State v. McFadden*, 320 N.W.2d 608 (Iowa 1982); *State v. Youngblut*, 257 Iowa 343, 132 N.W.2d 486 (1965). In *Youngblut*, the defendant and another driver were drag racing in the streets of Waterloo, Iowa, when the other driver struck a third vehicle, causing the death of a passenger in the third vehicle. 257 Iowa at 345–46, 132 N.W.2d at 487. A charge of manslaughter against the defendant was dismissed by the district court. *Id.* at 344, 132 N.W.2d at 486. The defendant sought to uphold the dismissal on the state's appeal, arguing the minutes of testimony did not charge a crime because "they do not state decedent's death was caused by an unlawful act of defendant" insofar as there was no contact between the defendant's car and the third party's vehicle. *Id.* at 344–45, 132 N.W.2d at 486. This court reversed, holding:

> A defendant may be found guilty of manslaughter by entering into an agreement to conduct an automobile race on a city street and doing so in a reckless manner, with wanton disregard for the safety of others, from which the death of another results.

*Id.* at 346, 132 N.W.2d at 487. We relied on a California case in which the court had held that the acts of both drivers in a drag race " 'led directly to and were a proximate cause of [an innocent person's death].' " *Id.* at 347, 132 N.W.2d at 488 (quoting *People v. Kemp*, 310 P.2d 680, 683 (Cal. Ct. App. 1957)).

In *McFadden*, the defendant was a participant in a drag race that became deadly when the vehicle driven by his opponent, Sulgrove, hit a third vehicle, killing Sulgrove and a passenger in the third vehicle. 320 N.W.2d at 609–10. The defendant was convicted of two counts of involuntary manslaughter. *Id.* at 610. With respect to the innocent victim, the defendant was found guilty as a principal and under theories of vicarious liability—aiding and abetting and joint criminal conduct—based on Sulgrove's commission of involuntary manslaughter. *Id.* The defendant's responsibility for Sulgrove's death could not be sustained under a vicarious liability theory, however, because Sulgrove could not be guilty of involuntary manslaughter with respect to his own death. *Id.* (noting "the involuntary manslaughter statute requires proof that the perpetrator caused the death of 'another person'" (quoting Iowa Code § 707.5(1))). Consequently, on appeal this court focused its discussion on whether the defendant was liable as a principal for involuntary manslaughter, specifically whether "defendant's reckless commission of the public offense of drag racing was a proximate cause of the [two] deaths." *Id.* We concluded there was sufficient evidence from which the fact finder could find that, " 'but for the defendant's conduct, the harm or damage would not have occurred.'" *Id.* at 615 (quoting *State v. Marti*, 290 N.W.2d 570, 584–85 (Iowa 1980)); *see also Marti*, 290 N.W.2d at 579 ("It is not essential for conviction in all cases that the accused actively participate in the immediate physical impetus of death.").

Relying on the causation analysis of *McFadden* and *Marti*, the Iowa Court of Appeals has affirmed a second-degree murder conviction of a participant in a gun battle even though the fatal bullet that hit an innocent bystander was fired by the defendant's opponent. *State v. Brown*, 589 N.W.2d 69, 72 (Iowa Ct. App. 1998), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 26 (Iowa 2001). The defendant in *Brown* claimed on

appeal that there was insufficient proof that his conduct was a proximate cause of the bystander's death. *Id.* at 74. The court of appeals rejected this contention:

> [The defendant's] engagement in conduct that created a very high risk of death or serious bodily injury to others was a proximate cause of [the bystander's] death. This is true whether it was the defendant or another participant in the shoot-out who fired the shot that killed the innocent bystander.

*Id.* at 74–75 (citations omitted). The court also held "that if death to an innocent bystander ensues from gang-style gunplay in a crowded urban area, each participant in the lethal encounter has exhibited malice." *Id.* at 75. Therefore, the court concluded, "[t]he State presented sufficient evidence of malice aforethought by showing [the defendant's] intent to cause someone bodily harm immediately before [the bystander's] death." *Id.*

Our cases support a conclusion that the acts of a defendant engaged in mutual combat can be the proximate cause of injury to an innocent bystander that directly results from the act of another combatant. Provided the defendant possesses the requisite *mens rea* for the crime charged, he can be held liable as a principal. We think the same participation in mutual combat can also provide a basis to hold the defendant responsible as an aider and abettor under Iowa law.

> To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission.

*State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000). We agree with those courts that have concluded participants in mutual combat encourage each other to engage in the potentially lethal conduct that leads to the injury of innocent bystanders, thereby supporting liability as an aider and abettor.

**F. Propriety of Mutual-Combat Instruction.** The mutual-combat instruction given by the trial court in this case was very narrow, addressing only one element of the first-degree murder charge. The marshaling instruction of the court on this charge contained two alternatives, one based on principal liability and one based on a theory of aiding and abetting. The first alternative required that the jury find (1) the defendant shot the bystander, (2) the bystander died as a result of being shot, (3) the defendant acted with malice aforethought, and (4) the defendant was participating in one of the specified forcible felonies. The second alternative required proof that (1) "some person" shot the bystander, (2) the bystander died as a result of being shot, (3) the person who shot the bystander acted with malice aforethought, (4) the person who shot the bystander was participating in one of the specified forcible felonies, and (5) the defendant either aided and abetted the shooter or acted together with the shooter. The jury was instructed that " '[a]id and abet' means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed."

The court's instruction on mutual combat addressed only the fifth element of the second alternative: the defendant's act of aiding and abetting. The instruction provided:

> If you find that either of the defendants, or any person or persons that either of the defendants was acting together with, were voluntarily engaged in mutual combat by shooting guns at each other and that, by exchanging gunfire, they jointly created a zone of danger likely to result in the death or injury of innocent bystanders, *then you may also find that each of the combatants, including the defendant, aided and abetted each of the other combatants* and it makes no difference which of the combatants fired the first shot or which of the combatants fired the shot which struck and killed [the victim].

(Emphasis added.) The court did not instruct on mutual combat as a basis for proximate cause liability as a principal, nor as a basis to prove the required *mens rea* for first-degree murder. Therefore, the issue presented in this case, as framed by the defendant's objection, is simply whether a defendant engaged in mutual combat may be held to have aided and abetted a cocombatant when the identity of the murderer cannot be established.

We first note the general principle that it is not necessary for the prosecution to prove the identity of the murderer to establish that a defendant "aided or abetted the murderer or engaged in joint criminal conduct with him." *State v. Kern*, 307 N.W.2d 29, 30 (Iowa 1981). The prosecution must simply prove that the murderer was one of the persons whom the defendant aided and abetted. *Id.* We think the same principles hold true when aiding-and-abetting liability is imposed on a mutual combatant. The primary distinction between garden-variety aiding and abetting and mutual-combat aiding and abetting is that the existence of mutual combat provides a factual basis for holding a defendant combatant vicariously liable for the murderous conduct of any other combatant, even an opponent of the defendant. We find no basis in this distinction that would warrant a different rule with respect to the necessity of establishing the identity of the murderer. So long as the murderer is shown to be another participant in the mutual combat, the necessary factual link between the defendant's aiding and abetting and the actual murder is present. Therefore, we hold a mutual-combat instruction on aiding and abetting is appropriate even when the identity of the murderer cannot be shown.

Here, the jury was instructed that, if the defendant was engaged in mutual combat, the jury could find that he aided and abetted every other combatant. The marshaling instruction required that the State prove the

defendant aided and abetted the person who shot the bystander. Therefore, before the jury could have found the defendant guilty as an aider and abettor under the mutual-combat instruction, it would have to find that the shooter was one of the combatants. Our review of the record shows there was substantial evidence that the fatal shot came from one of the persons engaged in the shootout, even though the identity of everyone involved could not be ascertained. We conclude, therefore, that the trial court did not err in giving a mutual-combat instruction notwithstanding the State's inability to prove the identity of the shooter.[6]

### IV. Disposition.

The defendant did not preserve error on the trial court's failure to submit the lesser-included offense of voluntary manslaughter. The trial court did not err in instructing on mutual combat as a basis for aider-and-abettor liability. We vacate the court of appeals' decision only with respect to its discussion of the alleged instructional errors and affirm the defendant's conviction and sentence.

**DECISION OF COURT OF APPEALS VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Baker, J., who takes no part.

---

[6]Anticipating that our conclusion there is no merit to the challenge made in this case to the mutual-combat instruction may prompt trial courts to use the same instruction given in this case in future trials, we caution that the instruction at issue here may not be free from error. The instruction given in this case allows a finding of aiding and abetting if "either of the defendants, *or any person or persons that either of the defendants was acting together with*, were voluntarily engaged in mutual combat." (Emphasis added.) But for aiding-and-abetting liability, the *defendant himself* must " 'knowingly approve[] and agree[] to the commission of a crime, either by *active participation* in it or by *knowingly advising or encouraging* the act in some way before or when it is committed.' " *State v. Allen*, 633 N.W.2d 752, 754 (Iowa 2001) (emphasis added) (quoting I Iowa Crim. Jury Instruction 200.8 (1998)). Arguably, the focus of the instruction given by the court in this case is too broad, and the instruction should require that the defendant himself be engaged in mutual combat before he can be held to have aided and abetted other combatants.